UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ERIC G. FOX,

                    Plaintiff,

v.                                                    Case No.  5:09-cv-376-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                    Defendant.
_____

## ORDER

        Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying her disability insurance benefits.  (Doc. 1.)  The

Commissioner has answered (Docs. 4 & 9) and both parties have filed briefs outlining

their respective positions.  (Docs. 10 & 11.)  For the reasons discussed below, the

Commissioner's decision is due to be **AFFIRMED** under sentence four of 42 U.S.C.

§405(g).

## I.  PROCEDURAL HISTORY

        Plaintiff filed an application for a period of disability and disability insurance

benefits (R. 53-56) claiming a disability onset date of March 6, 2004.  Plaintiff's

application was denied initially and upon reconsideration. (R. 35-38, 46-47, 49-50.)

Thereafter, Plaintiff timely pursued his administrative remedies available before the

Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ").

(R. 45.)  ALJ Philemina M. Jones conducted Plaintiff's administrative hearing on May

14, 2007. (R. 387-408.)  On July 16, 2007, ALJ Jones issued a decision partially

favorable to Plaintiff. (R. 17-33.)  On July 9, 2009, the Appeals Council denied Plaintiff's

request for review.  (R. 4-7.)  Plaintiff then appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.[3] The district court must view the evidence as a whole, taking

into account evidence favorable as well as unfavorable to the decision.[4] However, the

district court will reverse the Commissioner's decision on plenary review if the decision

applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] <u>See</u> 42 U.S.C. § 405(g).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] <u>Foote</u>, 67 F.3d at 1560; *accord,* <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III.  <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was fifty-two years old at the time of the hearing.  (R. 390-91.)   Plaintiff completed one year of college and then went through a four-year electrical apprenticeship program. (R. 391.)  Plaintiff has worked as a handyman, sound contractor and an electrician/foreman/division manager for an electric contracting company. (R. 392, 147.)  Plaintiff contends that, as of March 6, 2004, he was no longer able to work due to a shattered tibia plateau, bad knee and depression.  (R. 53.) Plaintiff was last insured for disability benefits on December 31, 2005. (R. 21.)

---

[18] <u>Walker</u> at 1003.

[19] <u>Wolfe</u> at 1077-78.

[20] <u>See</u> <u>id</u>.

[21] <u>See</u> <u>Doughty</u> at 1278 n.2.

Beginning in February 2002,  Plaintiff's primary care physician, Robert Holstein, D.O. treated Plaintiff for a number of conditions including sore throat, cold, rash, sinusitis, hyperlipidimia and anxiety depression  (R. 131-45, 293-316.)  Dr. Holstein prescribed Paxil and noted that Plaintiff did not exhibit abnormal or psychotic thoughts, his judgment and insight were good, he was oriented to person, place and time, his attention span and concentration were good and his mood and affect were appropriate to the situation. (R. 132-33, 138, 140, 143.) Dr. Holstein encouraged Plaintiff to lose weight and increase his exercise. (R. 138.)

On March 6, 2004, Plaintiff was involved in a motorcycle accident in which he fractured his right tibial plateau.  That day, William Stalcup, D.O. performed an open reduction internal fixation of his right tibia. (R. 199.)  Over the next eight months, Plaintiff saw Dr. Stalcup. (R. 186-231.)   During this period, Plaintiff completed physical therapy at The Achievement Center. (R. 114-30.)   Because Plaintiff continued to have significant pain, Dr. Stalcup removed the hardware and performed a total knee arthroplasty on November 16, 2004. (R. 180-85.)   On April 28, 2005, Dr. Stalcup prescribed a heel lift to correct a discrepancy in the length of his legs.  (R. 170.)  By June 20, 2005, Plaintiff reported no particular pain in his knee but he reported discomfort in the shin region medially and laterally.  (R. 169.)  The pain was "somewhat tolerable," over the counter inflammatory medications did not offer any significant relief, and therefore it was noted that Plaintiff is "learning to deal with it."   Plaintiff reported losing 25 pounds and that he is attending the gym for water therapy.   On examination, Plaintiff was in no acute distress.

6

On October 25, 2004, Dr. Holstein completed a form in which he noted that Plaintiff suffers from a mental impairment that significantly interferes with daily functioning, that he has prescribed Paxil for the condition but that no referral has been made for formal psychiatric/psychological treatment. (R. 131.)

On December 13, 2004, Steven L. Weiss, Ph.D., P.A. completed a psychological evaluation. (R.146-48.)   Plaintiff reported that depression had its onset in 1968 during which time he made a suicide attempt. He reported that his depressed mood is "mostly controlled" with Paxil and that he is irritable when not taking the medication.  His energy is low and there is difficulty concentrating.  He prefers to be by himself but does not experience feelings of uselessness or low self esteem.  His sleep is sometimes restless but generally is within acceptable limits.  He denied suicidal intent but stated that he sometimes had fleeting suicidal ideation.  Plaintiff could recall the months of the year forward and backward quickly and without error; could do simple arithmetic in his head; was oriented times three; could perform five serial instructions without error; recalled 3 out of 4 words after 10 minutes; attention span was within normal limits; and his insight and judgment were within normal limits. Dr. Weiss diagnosed depressive disorder, NOS.

On December 20, 2004, a single decision maker ("SDM") completed a physical RFC assessment (R. 149-56) finding that Plaintiff could frequently lift and/or carry 50 pounds or more; stand and/or walk about 6-hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; push and/or pull without limitation; and occasionally climb, balance, stoop, kneel, crouch and crawl.   On December 30, 2004, state agency psychologist, Michael H. Zelenka completed a Psychiatric Review Technique form in

which he noted that Plaintiff's affective disorder was not severe and resulted in no functional limitations. (R. 157-68.)

Beginning July 21, 2005, Plaintiff was treated at Southeastern Rehabilitation Medicine by Anuj Sharma, D.O.. (R. 317-63.)  An MRI of the cervical spine on August 8, 2005 showed a moderate diffuse disc bulge at C6-C7; mild central spinal and bilateral neural foraminal narrowing atC6-C7; moderate bilateral neural foraminal narrowing at C5-C6; and multilevel degenerative changes at the cervical spine, most prominent at C5-C6 and C6-C7.  (R. 359-60, 362-63.)

On August 8, 2005, Plaintiff was seen by Timothy L. Byrd, M.D.  for depression. (R. 244-46.)  Plaintiff reported mood dysphoria, feelings of sadness and hopelessness, passive suicidal ruminations, increasing isolation and withdrawal , lack of initiative, apathy, energy, anhedonia, hypersomnia, weight gain, extreme anger and irritability, chronic anxiety and inability to handle stress.  (364-78.) On examination, Plaintiff's mood was troubled and depressed and he was somewhat negativistic.  He denied hopelessness or suicidal ideation.  His affect was appropriate, mood congruent, thought processes were organized and goal directed and thought content was of normal quantity and quality. Perceptions appeared accurate, speech and language were coherent and relevant and of normal rate and amplitude.  Cognitive functions appeared grossly intact.  Dr. Byrd's impression was major depressive disorder, recurrent, moderate to severe without psychotic features and dysthymic disorder.  He recommended that Plaintiff increase the dosage of Paxil and start individual psychotherapy.   There is no record of Plaintiff seeing Dr. Byrd again until one year later on August 23, 2006 – eight months after Plaintiff's date last insured. (R. 376-78.)

On October 6, 2005, Plaintiff was seen by Dr. Holstein for evaluation and management of hyperlipidemia. (R. 303-05.)   Dr. Holstein noted that Plaintiff was in no apparent distress; his neck was supple; his back revealed no tenderness; deep tendon reflexes and coordination were normal; muscle strength was 4/5 for all groups tested; and his gait and station were without abnormalities. (R. 303-04.)

On October 13, 2005, Dr. Sharma – Plaintiff's treating physician – noted that Plaintiff was doing "okay"; was in aquatic therapy and his joint pain was better. (R. 344.) On examination, Plaintiff exhibited no acute pain behavior; his gait cycle was essentially intact; he had mild swelling of the MCP joints of the hands and tightness over the cervical paraspinal musculature but there were no tender points in the extremities other than the right knee; strength was 5/5 for all extremities and no focal weakness was noted; and his coordination and deep tendon reflexes were normal.

Dr. Sharma's objective treatment notes from October 17, 2005 were substantially the same. (R. 341-42.)  While Plaintiff reported pain and paresthesias in both hands, he noted that Mobic had been helpful and EMG testing results on his hands were only "mildly abnormal", revealing only mild neuropathy with no evidence of cervical radiculopathy.   Dr. Sharma explained treatments for carpal tunnel syndrome and advised use of wrist splints during activities and at night.  Over the next seven months, Dr. Sharma's objective notes were essentially the same.  (R. 333-34, 335-38, 339-40.) Plaintiff reported that the Mobic and therapy program were helpful and Dr. Sharma emphasized the importance of complete compliance with the home exercise program.

That same day, Dr. Sharma completed a Physical Capacities Evaluation in which he opined that Plaintiff could never lift or carry more than 10 pounds and only

9

occasionally lift and carry up to 10 pounds; could push and pull, crawl, climb and reach above the shoulder occasionally; could bend and squat seldom; could sit, stand, walk and alternate between sitting and standing only 1 hour each; could not use his hands on repetitive actions such as grasping or fine manipulation; and had pain that would affect his ability to concentrate in a work-like setting.   (R. 112-14.)  Dr. Sharma completed the same form again on February 2, 2007 with similar findings. (R. 317-20.)

On November 4, 2005 and then again on February 15, 2007, Dr. Byrd completed a form entitled "Mental Disorders Disability Evaluation For Social Security" on November 4, 2005.  (R. 232-43.)  He noted that Plaintiff's affective disorder was severe, had lasted for at least 18 months and resulted in marked difficulties in maintaining social functioning and concentration, persistence or pace, and four or more repeated episodes of decompensation.   Dr. Byrd found that Plaintiff was extremely limited in his ability to complete a normal workday/workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; markedly limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; markedly limited in his ability to tolerate and interact appropriately with the general public; markedly limited in his ability to accept instructions and to respond appropriately to criticism from supervisors; and markedly limited in his ability to set realistic goals or to make plans independently of others.   Dr. Byrd completed the same form again in February 2007 and opined that Plaintiff had similar functional limitations. (R. 364-75.)

Plaintiff saw Dr. Holstein in November 2005 with complaints of a testicular mass. (R. 300.)  He was in no apparent distress and his neck exam revealed no abnormalities.

10

In a Function Report dated November 25, 2005 that was filed with the Social Security Administration, Plaintiff reported having no problems with personal care; made dinner, taking one hour; could do laundry and vacuuming; attended church for two hours each Sunday and small group meeting on Thursday evening; could shop in stores, by computer, by phone, or by mail approximately one time per week; and could handle his own finances.  (R. 104-07.)

On December 1, 2005, state agency physician, A. Alvarez-Mullin, M.D. completed a mental RFC assessment (R. 247-49) and psychiatric review technique form. (R. 250-63.)   Based on his review of the evidence, he concluded that Plaintiff had a recurrent major depressive disorder and dysthymic disorder that resulted in no extreme or marked limitations.  He found that Plaintiff was moderately limited in his ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek; to interact appropriately with the general public; and to set realistic goals or make plan independently of others.

On December 27, 2005, Nancy L. Kopitnik, DO performed a consultative examination. (R. 264-70.)  Dr. Koptinik found Plaintiff in no acute distress, ambulating freely without problems and without an assistive device.    Plaintiff's neck was supple, although it was noted that Plaintiff had an abnormal range of motion of the neck; his extremities were non-tender to touch and grossly normal to observation with no loss of sensation; there was minimal loss of grip strength in both upper extremities to 4/5; and gross and fine manipulation were grossly intact.  As for lower extremities, Plaintiff had 4/5 muscle strength in the flexors and extensors of the large muscle groups and 5/5

strength in the ankle and foot.  He was able to rise from a chair without using arms and did not appear generally weak.  Dr. Kopitnik also found that Plaintiff could bend at the waist to 70 degrees without pain and had limited rotation to the left and mild paravertebral spasm and straight leg raises were positive at 45 degrees.   Plaintiff could heel and toe walk; walked unassisted around the room without support and had a normal gait without any limp.   Dr. Kopitnik's impression was chronic neck pain, obesity, mixed anxiety and depression secondary to chronic pain and history of right knee replacement.

In May 2006, Plaintiff reported to Dr. Holstein that he was doing some work around the house; was in no apparent distress; his neck was supple; no back tenderness; deep tendon reflexes and coordination were normal; muscle strength was 5/5 for all groups tested; and gait and station revealed slow and deliberate movement. (R. 296-97.)

On June 29, 2006, Plaintiff returned to Dr. Sharma after injuring his neck and low back in another motor vehicle accident.  (R. 330-32.)  Because that second accident occurred more than five months after Plaintiff's date last insured, any impairments that may have arisen from the accident were irrelevant.  However, by November 2006, Dr. Sharma noted that Plaintiff was doing very well; that he was almost back to his baseline; that his medications were "particularly effective" in controlling his pain; and that he only took oxycodone when absolutely necessary for severe pain. (R. 324.)

In November 2006, Plaintiff returned to see Dr. Holstein and it was noted that he had continued to lose weight and his neck and neurologic exams were unremarkable. (R. 294.)  Dr. Holstein advised Plaintiff to lose more weight and exercise as prescribed.

12

At the hearing, Plaintiff testified that he has arthritis in his right leg which is very painful and his leg is almost an inch shorter and that causes problems in his hip when he walks. (R. 393.)   Plaintiff reported bad arthritis in his left knee, neck, shoulders, fingers and all of his joint.  (Id.)  He testified that he has continual pain in his neck and shoulders.  (Id.)  Plaintiff has pain in his hands and they get numb and tingle from time to time and he has trouble using them.  (R. 393-94.)   Plaintiff testified that despite taking two different kinds of medication for depression he still has problems with anger and has no motivation to do anything. (R. 394.)   He does not sleep well and he does not interact well with groups of people.  (Id.)  Plaintiff testified that the first time he saw a mental health physician was in August 2005 when he began seeing Dr. Byrd. (R. 394-97.) However, he did not see Dr. Byrd again until August 2006. (R. 397.)

Plaintiff testified that he can walk for 30 minutes, stand for 15 minutes, and sit in one position for an hour or so. (R. 399-400.)  He testified that he has to alternate sitting and standing throughout the day, elevate and ice his right leg. (R. 400.)   On a typical day, Plaintiff wakes up with pain on a level of two to three on a scale of one to ten and it increases to a five or six as the day progresses, but that at level 6, he would take oxycodone to "settle [the pain] down." (Id.)   Plaintiff testified that he uses a cane but that no doctor prescribed it. (R. 401.)  Plaintiff testified that he takes Effexor, Wellburin and Mobic daily and Oxycodone as needed. (R. 402.)

After considering the record evidence, the ALJ determined that claimant suffers from status post open reduction internal fixation of the right tibia and fibular, knee arthroplasty, degenerative disc disease of the cervical region of the spine, mild carpal tunnel syndrome and affective disorder. (R. 354.)   However, the ALJ determined that

13

from March 6, 2004 through October 5, 2005, Plaintiff did not have an impairment or
combination of impairments which met or medically equaled one of the impairments
listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (Id.)

The ALJ then found that from March 6, 2004 through October 5, 2005, Plaintiff
retained the RFC to lift and carry less than 10 pounds occasionally, sit for less than six
hours in an eight-hour workday and stand/walk for less than two hours in an eight-hour
workday; and that Plaintiff's impairment imposed mild restriction of activities of daily
living, mild difficulties in maintaining social functioning, moderate difficulties in
maintaining concentration, persistence or pace without repeated episodes of
decompensation (R. 27.)  The ALJ then concluded that Plaintiff was disabled because
he was unable to perform his past relevant work and there were no jobs that existed in
significant numbers in the national economy that Plaintiff could have performed.  (R. 27-
29.)

However, the ALJ found that Plaintiff experienced medical improvement
beginning on October 6, 2005 related to his ability to work.  (R. 29.)  The ALJ found that
beginning on October 6, 2005, Plaintiff did not have an impairment or combination of
impairments which met or medically equaled one of the impairments listed in Appendix
1, Subpart P of Social Security Regulation No. 4. (R. 29.)  He found that Plaintiff had the
RFC to lift 50 pounds occasionally and 25 pounds frequently and sit, stand or walk for
about six hours in an eight-hour workday.  He was able to occasionally climb, balance,
stoop, kneel, crouch or crawl and his mental impairment imposes mild restriction of
activities of daily living, mild difficulties in maintaining social functioning, moderate
difficulties in maintaining concentration, persistence or pace without repeated episodes

14

of decompensation.  He could perform simple, routine, repetitive tasks. The ALJ

concluded that although Plaintiff could not perform his past relevant work, beginning on

October 6, 2005, he could perform a significant number of jobs in the national economy.

(R. 32-33.)

## IV.  DISCUSSION

### A.  The ALJ's Finding That Plaintiff Reached Medical Improvement As Of October 6, 2005 Was Supported By Substantial Record Evidence

The ALJ found that from March 6, 2004 through October 5, 2005, Plaintiff was

disabled due to pain and mobility restrictions in the use of his surgically repaired knee.

(R. 27.)  On March 6, 2004, Dr. Stalcup performed an open reduction internal fixation of

Plaintiff's right tibia. (R. 199.)  Plaintiff underwent physical therapy which showed

reduced range of motion of the knee, unstable gait and the use of crutches. (R. 25, 115,

119-21.)  On November 16, 2004, Dr. Stalcup removed the hardware and performed a

total knee arthroplasty. (R. 180-85.)   By June 20, 2005, Plaintiff reported no particular

pain in his knee but that he had discomfort in the shin region.  (R. 169.)   Plaintiff

reported losing 25 pounds and that he attended the gym for water therapy.   On

examination, Plaintiff was in no acute distress; and his range of motion of the right knee

was essentially unremarkable with sensation grossly intact.   (R. 25, 169.)

The ALJ concluded that as of October 6, 2005, Plaintiff was no longer disabled

and regained the RFC to lift 50 pounds occasionally and 25 pounds frequently and sit,

stand or walk for about six hours in an eight-hour workday; occasionally climb, balance,

stoop, kneel, crouch or crawl; and that his mental impairment imposes only mild

restrictions of activities of daily living, mild difficulties in maintaining social functioning,

and moderate difficulties in maintaining concentration, persistence or pace without repeated episodes of decompensation.  The ALJ concluded that Plaintiff could perform simple, routine, repetitive tasks.

Contrary to Plaintiff's contention, the ALJ's conclusion was not based solely upon the October 6, 2005 report of Dr. Holstein.  Indeed, the ALJ explained that since October 6, 2005, Plaintiff has not been in acute distress; his gait and station have been without any significant abnormalities; and that while there had been very slight motor strength deficits they had not prevented Plaintiff from riding his new Harley.

On October 13, 2005, Dr. Sharma – Plaintiff's treating physician – noted that Plaintiff was doing "okay"; was in aquatic therapy and his joint pain was better. (R. 344.) On examination, Plaintiff exhibited no acute pain behavior; his gait cycle was essentially intact; he had mild swelling of the MCP joints of the hands and tightness over the cervical paraspinal musculature but there were no tender points in the extremities other than the right knee; strength was 5/5 for all extremities and no focal weakness was noted; and his coordination and deep tendon reflexes were normal.

Dr. Sharma's objective treatment notes from October 17, 2005 were substantially the same. (R. 341-42.)  While Plaintiff reported pain and paresthesias in both hands, he noted that Mobic had been helpful and EMG testing results on his hands were only "mildly abnormal", revealing only mild neuropathy with no evidence of cervical radiculopathy.   Dr. Sharma explained treatments for carpal tunnel syndrome and recommended use of wrist splints during activities and at night.  Over the next seven months, Dr. Sharma's objective treatment notes were essentially the same.  (R. 333-34, 335-38, 339-40.)  Plaintiff reported that the Mobic and therapy program were helpful and

16

Dr. Sharma emphasized the importance of complete compliance with the home exercise program.

On June 29, 2006, Plaintiff returned to Dr. Sharma after injuring his neck and low back in another motor vehicle accident.  (R. 330-32.)  Because that second accident occurred more than five months after Plaintiff's date last insured, any impairments that may have arisen from the accident were irrelevant.  However, by November 2006, Dr. Sharma noted that Plaintiff was doing very well; that he was almost back to his baseline; that his medications were "particularly effective" in controlling his pain; and that he only took oxycodone when absolutely necessary for severe pain. (R. 324.)

Accordingly, Dr. Sharma's objective findings do not show debilitating limitations during the relevant time period and, thus, support the ALJ's conclusion that Plaintiff had achieved medical improvement.

Dr. Holstein's treatment notes also provide support for the ALJ's conclusion that Plaintiff was no longer disabled.  On October 6, 2005, Dr. Holstein noted that Plaintiff was in no apparent distress; his neck was supple; his back revealed no tenderness; deep tendon reflexes and coordination were normal; muscle strength was 4/5 for all groups tested; and his gait and station were without abnormalities. (R. 303-04.)   Dr. Holstein's impression at that time was hyperlipidemia.  Plaintiff saw Dr. Holstein in November 2005 with complaints of a testicular mass.  (R. 300.)  Plaintiff was in no apparent distress and his neck exam revealed no abnormalities.  In May 2006, Plaintiff reported doing some work around the house; was in no apparent distress; his neck was supple; no back tenderness; deep tendon reflexes and coordination were normal; muscle strength was 5/5 for all groups tested; and gait and station revealed slow and

deliberate movement. (R. 296-97.)  In November 2006, Plaintiff continued to lose weight and his neck and neurologic exams were unremarkable. (R. 294.)  Dr. Holstein advised Plaintiff to lose more weight and exercise as prescribed.

In addition, Dr. Koptinik's consultative examination report from December 27, 2005 supports the ALJ's finding that Plaintiff was not disabled after October 6, 2005. (R. 264-67.)  Dr. Koptinik found Plaintiff in no acute distress, ambulating freely without problems and without an assistive device.  Plaintiff's neck was supple, although it was noted that Plaintiff had an abnormal range of motion of the neck; his extremities were non-tender to touch and grossly normal to observation with no loss of sensation; there was minimal loss of grip strength in both upper extremities to 4/5; and gross and fine manipulation were grossly intact.  As for lower extremities, Plaintiff had 4/5 muscle strength in the flexors and extensors of the large muscle groups and 5/5 strength in the ankle and foot.  He was able to rise from a chair without using arms and did not appear generally weak.  Dr. Kopitnik also found that Plaintiff could bend at the waist to 70 degrees without pain and had limited rotation to the left and mild paravertebral spasm and straight leg raises were positive at 45 degrees.   Plaintiff could heel and toe walk; walked unassisted around the room without support and had a normal gait without any limp.   Dr. Kopitnik's impression was chronic neck pain, obesity, mixed anxiety and depression secondary to chronic pain and history of right knee replacement.

Likewise, the ALJ's conclusion that Plaintiff was not disabled due to mental impairments after October 6, 2005 is supported by the record.[22]  The ALJ concluded that Plaintiff's mental impairment imposed mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace without repeated episodes of decompensation. (R. 29.)

Dr. Byrd began treating Plaintiff for mental health issues in August 2005.  (R. 244-26.)  While Plaintiff's mood was troubled and depressed and he was somewhat negativistic, he denied hopelessness or suicidal ideation.  His affect was appropriate, mood congruent, thought processes were organized and goal directed and thought content was of normal quantity and quality. Perceptions appeared accurate, speech and language were coherent and relevant and of normal rate and amplitude.  Cognitive functions appeared grossly intact.  Dr. Byrd's impression was major depressive disorder, recurrent, moderate to severe without psychotic features and dysthymic disorder.  He recommended that Plaintiff increase the dosage of Paxil and start individual psychotherapy.

Dr. Byrd's next examination notes were from one year later – August 23, 2006 – (R. 376-78.)  Plaintiff reported being unhappy in his marriage, that he was seeing his old girlfriend but that he was feeling better on Effexor. (R. 378.)  He had no overt psychosis or suicidality.  His diagnosis at the time was MDD, mild without psychosis.  On

---

[22] The ALJ never found Plaintiff's mental impairments to be disabling at any time.  Indeed, the ALJ concluded that during his period of disability, Plaintiff had only mild restrictions in activities of daily living and maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (R. 29.)

November 15, 2006, Plaintiff reported the purchase of a new Harley Davidson motorcycle and continued marital conflict. (R. 377.)  He reported feeling more depressed, anhedonic and anergic. However, there was no overt mania or psychosis and he was not suicidal.  Plaintiff was diagnosed with MDD, mild to moderate without psychosis and his Wellbutrin and Effexor were increased.  In February 2007, Plaintiff reported continued stress and ambivalence regarding his marriage, but no suicidality or psychosis and no side effects.  (R. 376.)  Once again, Plaintiff was diagnosed with MDD, recurrent mild without psychosis.

The ALJ's findings were also consistent with Dr. Weiss's December 13, 2004 psychological consultative examination. (146-48.)  Plaintiff reported that his depressed mood is "mostly controlled" with Paxil and that he is irritable when not taking the medication.  While he prefers to be by himself, Plaintiff does not experience feelings of uselessness or low self esteem.  His sleep is sometimes restless but generally is within acceptable limits.  He denied suicidal intent but stated that he sometimes had fleeting suicidal ideation.  Plaintiff could recall the months of the year forward and backward quickly and without error; could do simple arithmetic in his head; was oriented times three; could perform five serial instructions without error; recalled 3 out of 4 words after 10 minutes; attention span was within normal limits; and his insight and judgment were within normal limits. Dr. Weiss diagnosed depressive disorder, NOS.

Finally, state agency psychiatrist, A. Alvarez-Mullin, M.D. completed a mental RFC assessment and psychological review technique forms on December 1, 2005. (R. 247-49, 250-63.)  Alvarez-Mullin found that Plaintiff had a recurrent major depressive disorder and dysthymic disorder that resulted in no extreme or marked limitations.

20

Alvarez-Mullin noted only mild restrictions in activities of daily living and social functioning; moderate limitations in maintaining concentration, persistence and pace; and no episodes of decompensation. (R. 260.)  In the mental RFC, Alvarez-Mullin found that Plaintiff was no more than moderately limited in any area and noted that his activities of daily living did not support marked and extreme impairments. (R. 247-49.)

Accordingly, based on the above, the Court concludes that the ALJ's finding that Plaintiff reached medical improvement as of October 6, 2005 was supported by substantial record evidence.

## B.    The ALJ Properly Considered The Treating Physician Opinions

Plaintiff argues that the ALJ improperly rejected and ignored the opinions of Plaintiff's treating physicians – Dr. Sharma and Dr. Byrd.

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[23]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[24]

---

[23] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[24] 20 C.F.R. § 404.1527(d)(2).

However, the ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[25]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[26]

Upon a review of the ALJ's decision, as well as an examination of the medical records at issue, the Court finds that the ALJ  properly considered the opinions of Dr. Sharma and Dr. Byrd as treating physicians and articulated good cause for discounting their opinions.

In October 2005 and February 2007, Dr. Sharma opined that Plaintiff could never lift or carry more than 10 pounds and only occasionally lift and carry up to 10 pounds; could push and pull, crawl, climb and reach above the shoulder occasionally; could bend and squat seldom; could sit, stand, walk and alternate between sitting and standing only 1 hour each; could not use his hands on repetitive actions such as grasping or fine manipulation; and had pain that would affect his ability to concentrate in a work-like setting. (R. 112-14, 318-19.)

The ALJ correctly stated that Dr. Sharma's opinion was inconsistent with the record and cited medical evidence in the record, including Dr. Sharma's own treatment notes, which as discussed above, do not support such severe restrictions.  (R. 32.)

---

[25] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[26] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

22

Dr. Sharma consistently noted that Plaintiff exhibited no acute pain behavior; his gait cycle was essentially intact; he had mild swelling of the MCP joints of the hands and tightness over the cervical paraspinal musculature but there were no tender points in the extremities other than the right knee; strength was 5/5 for all extremities and no focal weakness was noted; and his coordination and deep tendon reflexes were normal. (R. 333-34, 335-38, 339-40, 341-42.)   While Plaintiff was involved in another motor vehicle accident in June 2006 – which was more than five months after Plaintiff's date last insured, and thus, any impairments that may have arisen from the accident were irrelevant – by November 2006, Dr. Sharma noted that Plaintiff was doing very well; that he was almost back to his baseline; that his medications were "particularly effective" in controlling his pain; and that he only took oxycodone when absolutely necessary for severe pain. (R. 324.)   Accordingly, Dr. Sharma's opinions in October 2005 and February 2007 that Plaintiff had debilitating limitations are not supported by his own treatment records.

Nor are they supported by the treatment notes of Dr. Holstein and Dr. Kopitnik. While Dr. Holstein noted in May 2006, that Plaintiff's gait and station exam revealed slow and deliberate movement, his findings were otherwise normal – i.e., Plaintiff was in no apparent distress; neck was supple; no back tenderness; deep tendon reflexes and coordination were normal; and muscle strength was 5/5 for all groups tested. (R. 296-97.)  Moreover, on October 6, 2005, Dr. Holstein's findings were largely the same – except, he also noted that Plaintiff's gait and station were without abnormalities. (R. 303-04.)

Likewise, other than noting some reduced range of motion in the lumbar and cervical spines and positive results on straight leg raises, Dr. Koptinik's findings on examination were largely normal.  (R. 264-67.)  Dr. Koptinik found Plaintiff in no acute distress,  Plaintiff's neck was supple; his extremities were non-tender to touch and grossly normal to observation with no loss of sensation; there was minimal loss of grip strength in both upper extremities to 4/5; and gross and fine manipulation were grossly intact; Plaintiff had 4/5 muscle strength in the flexors and extensors of the large muscle groups of lower extremities and 5/5 strength in the ankle and foot; he was able to rise from a chair without using arms and did not appear generally weak; he could heel and toe walk; walked unassisted around the room without support and had a normal gait without any limp.

In addition, the ALJ correctly noted that Plaintiff's reported daily activities were inconsistent with Dr. Sharma's severely restricting opinion. Plaintiff testified that he drives (R. 391), that he could walk 30 minutes, stand 15 minutes and sit in one position for an hour (R. 399) and that his pain level starts at a 2-3 out of 10 and could reach 5-6 out of 10 but that at level 6, he would take oxycodone to settle the pain. (R. 400-01.) Plaintiff reported that he had a girlfriend (R. 294, 376) and that he purchased a motorcycle in November 2006. (R. 377.)  In the Function Report, Plaintiff reported having no problems with personal care; made dinner, taking one hour; could do laundry and vacuuming; attended church for two hours each Sunday and small group meetings on Thursday evening; could shop in stores, by computer, by phone, or by mail approximately one time per week; and could handle his own finances.  (R. 104-07.)   It is

well-accepted that an ALJ may reject a treating physician's assessment that is inconsistent with an individual's actual activities.[27]

Thus, Dr. Sharma's treatment notes, other medical evidence and Plaintiff's daily activities – all of which were inconsistent with Dr. Sharma's findings of extreme functional limitations – are sufficient to reject Dr. Sharma's October 2005 and February 2007 evaluations.

Similarly, the ALJ addressed Dr. Byrd's opinion and found it overly extreme, exaggerated and inconsistent with the record evidence. (R. 32.)  On November 4, 2005 and then again on February 15, 2007 (R. 232-43, 364-75), Dr. Byrd noted that Plaintiff's affective disorder was severe and resulted in marked difficulties in maintaining social functioning and concentration, persistence or pace, and four or more repeated episodes of decompensation.  Dr. Byrd found that Plaintiff was extremely limited in his ability to complete a normal workday/workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; markedly limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; markedly limited in his ability to tolerate and interact appropriately with the general public; markedly limited in his ability to accept instructions and to respond appropriately to criticism from supervisors; and markedly limited in his ability to set realistic goals or to make plans independently of others.

---

[27] See e.g., Social Security Ruling 96-2p (http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-02-di-01.html)("For example, a treating source's medical opinion on what an individual can still do despite his or her impairment(s) will not be entitled to controlling weight if substantial, nonmedical evidence shows that the individual's actual activities are greater than those provided in the treating source's opinion.)

In rejecting Dr. Byrd's opinion, the ALJ noted that the record medical evidence showed Plaintiff to be alert and oriented in all spheres; he was not psychotic; denied any suicidal ideation; thought processes were goal-oriented; speech was normal and coherent; was able to take care of his own personal needs; and could manage his own funds. (R. 32.)  While Plaintiff is correct that those observations do not necessarily "negate the presence of depression in some individuals", Plaintiff has failed to identify any objective medical evidence showing functional limitations resulting from his depression.

As discussed above, Dr. Byrd's own limited treatment notes do not support the severe restrictions (R. 245, 376-78), nor does Dr. Weiss' consultative examination (R. 146-48) or the generally benign mental status findings of Dr. Holstein and Dr. Sharma. (R. 294, 296-97, 300-01, 304, 325, 326-27, 328-29, 332, 334, 340-41, 345.)  In addition, the ALJ correctly noted that Plaintiff's daily activities were not consistent with such severe limitations.  (R. 32, 104-07, 294, 376-77, 391, 399.)  Finally, Plaintiff testified that he had never been hospitalized for mental health reasons (R. 397-98) and there is no evidence in the record of psychological decompensation.

Accordingly, because the ALJ articulated good cause for discounting Dr. Byrd's November 4, 2005 and February 15, 2007 assessments, the ALJ properly discounted Dr. Byrd's opinions regarding Plaintiff's functional limitations.

### C.    The ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff argues that the ALJ improperly rejected Plaintiff's credibility with no evidentiary basis for doing so.   If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for

doing so, or the record must be obvious as to the credibility finding.[28] While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[29] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[30] However, a lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.[31] If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."[32]

Here, the ALJ found that since October 6, 2005, Plaintiff's medically determinable impairments could reasonably be expected to produce his alleged symptoms but that his statements regarding the intensity, persistence and limiting effects of the symptoms were not entirely credible. (R. 30-31.) In reaching this conclusion, the ALJ reviewed the medical evidence (as discussed above) which supported the ALJ's credibility finding and

---

[28] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[29] Foote at 1562-1563.

[30] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[31] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

[32] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

which evidence did not support Plaintiff's allegations of disabling impairments.  (R. 30-32.)   The ALJ also noted that Plaintiff's daily activities were inconsistent with the alleged severity of his pain and symptoms, particularly citing Plaintiff's activity of riding his new motorcycle, his ability to care for his own hygiene, pay his own bills and manage his funds. (R. 31-32, 105-07, 377.) Accordingly, the Court concludes that the ALJ articulated specific and adequate reasons for discrediting Plaintiff's subjective complaints.

### D.    The ALJ's RFC Finding Was Supported By Substantial Evidence

Plaintiff argues that the ALJ's RFC finding is inconsistent with the requirements of SSR 96-8p and that it is unsupported by the evidence.  Contrary to Plaintiff's argument, the ALJ thoroughly discussed how the evidence supported her RFC conclusion.  Indeed, the ALJ considered evidence from treating sources, examining sources, objective testing and daily activities – all of which supported the ALJ's RFC determination that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; he could sit, stand or walk 6 hours in an 8 hour day; he could occasionally climb, balance, stoop, kneel, crouch or crawl; and he could perform simple, routine, repetitive tasks. (R. 29.)

Plaintiff contends that the ALJ erred by according more weight to a non-medical source than to Dr. Sharma, a treating physician.  As discussed above, the ALJ articulated good cause for discrediting the opinion of Dr. Sharma.  While the ALJ relied on the opinions of a single decision maker ("SDM") (R. 31-32, 149-56), the ALJ's adoption of those opinions does no harm to the final decision which clearly was based on

a review of the whole record. The ALJ simply concluded that the opinions of the SMD were consistent with the entire medical record.[33]

Plaintiff also contends that the ALJ failed to mention his obesity. While there are references to Plaintiff's obesity in the record, and obesity may cause functional limitations, there is no evidence that Plaintiff is limited by his weight.  Indeed, Plaintiff was encouraged to exercise on several occasions. (R. 169, 294, 327, 334.)

Plaintiff also argues that the ALJ failed to assess any limitations due to Plaintiff's bilateral carpal tunnel syndrome.  While the ALJ found mild carpal tunnel syndrome to be a "severe" impairment, the ALJ correctly noted that: x-rays of Plaintiff's hands showed no abnormalities and EMG studies showed only mild neuropathy; Plaintiff's grip strength was essentially normal and gross and fine manipulations were grossly intact; examinations demonstrated only mild swelling of the MCP joints; and Plaintiff has been neurologically intact.  (R. 31.)  As discussed above, the ALJ articulated specific and adequate reasons for not crediting Dr. Sharma's Physical Capacities Evaluations in which he opined that Plaintiff could not use either hand for simple or firm grasping or fine manipulation.

Additionally, Plaintiff argues that the ALJ improperly ignored limitations found by the non-examining state agency physician, Dr. Alvarez-Mullin. (R. 247-63.)  Specifically, Dr. Alvarez-Mullin opined on the mental RFC assessment that Plaintiff could follow simple instructions "in a supportive-low stress setting" and that due to irritability, appears

_____

[33] Dunlop v. Astrue, 2008 WL 638333, *5 (M.D. Fla. March 5, 2008.)

capable of "casual/superficial interaction." (R. 249.)   Plaintiff contends that the ALJ found that Plaintiff could perform simple work but omitted the other limitations identified by Dr. Alvarez-Mullin and failed to explain why he was omitting them.

However, the ALJ expressed her RFC finding in general terms that were consistent with Dr. Alvarez-Mullin's psychological review technique form findings – i.e., that Plaintiff's mental impairment imposes "mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace without repeated episodes of decompensation" and limited Plaintiff to "simple, routine, repetitive tasks." (R. 29.)  Accordingly, the ALJ did not ignore the limitations identified by Dr. Alvarez-Mullin.

Moreover, the hypothetical question posed to the VE at the hearing was more specific and stated that Plaintiff was limited to simple instructions in a supportive low-stress setting, no work with the public, and only superficial interaction with others. (R. 405-07.)  These limitations mirror Dr. Alvarez-Mullin's functional capacities assessment.

Lastly, Plaintiff contends that the ALJ erred by failing to include the limitations identified by Dr. Byrd and Dr. Sharma in the RFC  However, as discussed above, the ALJ properly discounted the opinions of Dr. Byrd and Dr. Sharma.[34]

---

[34] Based on the Court's conclusion that the ALJ's RFC finding was supported by substantial evidence, the Court need not address Plaintiff's final argument that the hypothetical to the VE contained a defective RFC.  Doc. 10 at 24-25.

## V. <u>CONCLUSION</u>

In view of the foregoing, the decision of the Commissioner is due to be

**AFFIRMED** under sentence four of 42 U.S.C. § 405(g).   The Clerk is directed to enter

final judgment in favor of the Defendant consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on August 13, 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:

All Counsel